## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVE-ANN MUIR, for herself and all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>EARLY WARNING SERVICES, LLC; WELLS FARGO BANK, N.A.; BANK OF AMERICA, NATIONAL ASSOCIATION; FIRST ADVANTAGE BACKGROUND SERVICES CORP.; and JOHN DOES 1-10,<br><br>Defendants. | Civil Case Number: _____<br><br>**<u>CIVIL CLASS ACTION</u>**<br><br>**COMPLAINT AND<br>JURY DEMAND** |

Plaintiff alleges:

### <u>NATURE OF THIS ACTION</u>

1.      Plaintiff, STEVE-ANN MUIR, brings this action under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681, et seq. and Sherman Antitrust Act, 15 U.S.C. § 1.

2.      After offering to hire Plaintiff, Wells Fargo, N.A. ("<u>Wells Fargo</u>") obtained a background check of Plaintiff from First Advantage Background Services Corp. ("<u>First Advantage</u>"). As part of First Advantage's report, First Advantage submitted Plaintiff's name to Early Warning Services, LLC, ("EWS"). EWS's background report falsely stated that Plaintiff had been terminated by her previous employer, Bank of America, National Association ("<u>Bank of America</u>"), due to internal fraud and advised Wells Fargo not to hire her.

3. Plaintiff brings individual, non-class claims against Wells Fargo Bank, N.A., and class action claims against remaining Defendants.

4. Plaintiff is seeking statutory, actual, treble, and punitive damages, for herself and class members, along with injunctive and declaratory relief, attorney's fees and costs.

### FCRA STATUTORY FRAMEWORK

5. The FCRA governs how credit reports, including employee background reports, may be used for purposes of making employment decisions, and requires basic safeguards to protect the accuracy of such reports.

6. **Reasonable Procedures to Assure Maximum Accuracy of Reports**. Section 1681e(b) of the FCRA requires that a credit reporting agency maintain reasonable procedures to assure maximum possible accuracy of credit reports.

7. **Pre-Adverse Action Rights**. Under section 1681b(b)(3)(A) of the FCRA, any person intending to take adverse action in employment based upon a credit report must **first** provide the employee a copy of the credit report and a written description of the employee's rights under the FCRA, including a description of the employee's right to dispute information contained in the credit report.

8. These rights are commonly referred to as an employee's "Pre-Adverse Action Rights." Pre-Adverse Action Rights are meant to ensure that an employee or prospective employee has fair opportunity to review, and if necessary to dispute, a background report **before** it is used to take adverse action against the employee or prospective employee.

9. Under the FCRA, "adverse action" with respect to employment is defined broadly, and includes any, "decision for employment purposes that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(iii). Adverse action further includes,

"an action taken or determination that is made in connection with an application that was made by, or transaction that was initiated by, any consumer…. [a]nd adverse to the interests of the consumer." *Id.* §1681a(k)(1)(iv).

10. **Disclosure of Use for Employment Purposes**.  Under section 1681b(b)(2)(A) of the FCRA, the use of a consumer report for employment purposes is only permissible where, "a clear and conspicuous disclosure" is made to the consumer, "in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes."  The section further requires that the consumer provide his or her consent, in writing, to the use of the consumer report.

11. **Reasonable Procedures to Assure Permissible Purpose**.  Under section 1681e(a) of the FCRA, a credit reporting agency is obligated to maintain reasonable procedures to limit the use of credit reports to the purposes listed under section 1681b of the FCRA.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction under 28 U.S.C. § 1331; 15 U.S.C. §1681p; and 15 U.S.C. § 15(a).

13. All defendants regularly engage in business within this judicial district, and caused harm to Plaintiff in this judicial district.  Named Plaintiff was terminated from employment in New Jersey, and was denied a position of employment in New Jersey as a result of Defendants' unlawful conduct alleged below.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

15. Plaintiff is a natural person and a resident of New Jersey.

16.    **Early Warning Services, LLC,** ("EWS") is a Limited Liability Company organized under the laws of Delaware with a principal place of business in Scottsdale, Arizona.

17.    EWS is a joint venture owned by the following entities, or their affiliates: Bank of America Corporation; Wells Fargo & Company; JP Morgan Chase & Co.; BB&T Corporation; and Capital One Financial Corporation.

18.    EWS is a "consumer reporting agency" as defined under 15 U.S.C. §1681(f) of the FCRA.

19.    **First Advantage Background Services Corp**. ("First Advantage") is a corporation organized under the laws of Florida, with its principal place of business located in Atlanta, Georgia.

20.    First Advantage is a "consumer reporting agency" as defined under 15 U.S.C. §1681(f) of the FCRA.

21.    **Wells Fargo Bank, N.A**. ("Wells Fargo") is a national banking association, with its principal offices located at 101 N. Phillips Avenue Sioux Falls, South Dakota, 57104.  Wells Fargo is the principal subsidiary of Wells Fargo & Company.

22.    **Bank of America, National Association** ("Bank of America") is a nationally chartered banking association, with its principal offices located at 100 N. Tryon Street, Charlotte, North Carolina, 28202.  Bank of America is a subsidiary of Bank of America Corporation.

23.    John Does 1-10 are entities not presently known to Plaintiff, but whose identity will be learned with the aid of discovery.  John Does 1-10 may include affiliates of named Defendants.

## INTERNAL FRAUD PREVENTION SERVICE ("IFPS")

24. EWS facilitates information-sharing among thousands of institutions for the purpose of minimizing fraud across the financial services market. EWS combats a wide variety of fraud, for example credit card fraud and identity fraud.

25. "Internal fraud" refers to fraud against a bank or financial institution perpetrated by its own employees, specifically conduct in which employees knowingly cause, or exhibit an intent to knowingly cause, a loss to a financial institution. By way of example, such conduct includes stealing funds or selling client data.

26. EWS offers a proprietary service to financial institutions, which EWS calls the Internal Fraud Prevention Service ("IFPS"). The IFPS service involves three principal elements:

    (a) EWS solicits information regarding any employees who have committed internal fraud from across the financial services market. EWS stores this information in a database.

    (b) Based upon the information EWS receives from across the financial services market, EWS furnishes financial institutions with background reports regarding specific employees, detailing whether the employee has previously committed internal fraud at any other financial institution.

    (c) Upon information and belief, EWS provides its own analytics, including an instruction on whether an institution should or should not employ a specific employee, and a "severity" level, represented as a numerical value, regarding reported cases of internal fraud.

27. EWS requires any financial institution participating in the IFPS system to enter into a binding agreement with EWS. EWS has drafted and maintains Internal Fraud Prevention Services

Operating Rules (the "Operating Rules"), which it requires participating financial institutions to abide by.  The Operating Rules detail the types of conduct which may be reported within the IFPS system, including a definition of Internal Fraud.

## FACTS AS TO NAMED PLAINTIFF STEVE-ANN MUIR

28.   Plaintiff Steve-Ann Muir began working at Bank of America as a Sales and Service Specialist in or around December 2013 at a branch located in Tenafly, New Jersey.

29.   In or around February 2014 Ms. Muir was abruptly terminated from her employment with Bank of America in a meeting with Eduardo Velez (exact spelling unknown).

30.   Ms. Muir was not given a reason for her termination at or around the time it occurred, and was not informed she was suspected of internal fraud.

31.   Without Ms. Muir's knowledge, Bank of America reported to EWS that Ms. Muir was terminated from employment for internal fraud.

32.   Ms. Muir did not commit internal fraud while at Bank of America, nor at any other time. As EWS would later admit, there was no basis to report Ms. Muir for internal fraud.

33.   After leaving Bank of America, Ms. Muir sought employment at comparable positions in other banks in New Jersey.  As a result of her job search, in or around August 2014, and prior to September 5, 2014, Ms. Muir was offered a position of employment at Wells Fargo, as a Customer Sales and Service Representative – Retail (LO).

34.   At or about the time it offered employment to Ms. Muir, Wells Fargo contracted with First Advantage to perform a background check of Ms. Muir.

35.   Ms. Muir was directed to a portal maintained on the Internet by First Advantage for the purpose of facilitating pre-employment screening on behalf of Wells Fargo.  The First Advantage Internet portal was the only context in which First Advantage or Wells Fargo

provided purported disclosure to Ms. Muir regarding the use of consumer reports for employment purposes.

36. The First Advantage Internet portal did not disclose that any report concerning Ms. Muir would be procured from the IFPS system or from EWS.

37. The First Advantage Internet portal did not contain a clear and conspicuous disclosure, on a page with no other text, that a consumer report would be used for the purpose of screening Ms. Muir for employment at Wells Fargo.  Rather, upon information and belief, First Advantage provided an ambiguous disclosure which included a purported prospective waiver of employee rights.  Such disclosure is not "clear and conspicuous," and is not contained "in a document that consists solely of the disclosure," as required by section 1692b(b)(2)(A) of the FCRA, but rather, appears together with a purported prospective waiver.

38. On behalf of Wells Fargo, First Advantage submitted Ms. Muir's name to EWS to perform an IFPS background check.  EWS furnished to First Advantage an IFPS background report: (i) stating that Ms. Muir had been terminated from Bank of America for internal fraud; (ii) assigning an elevated "severity" level of 100 to Ms. Muir and/or the alleged internal fraud she supposedly committed; and (iii) advising Wells Fargo not to employ Ms. Muir.

39. In or around September 2014, after receiving the offer of employment from Wells Fargo, but before beginning to work there, Ms. Muir received a phone call, and a letter dated September 5, 2014, from a Wells Fargo representative advising her that Wells Fargo's offer was rescinded due to information contained in Ms. Muir's background report.  A copy of the September 5 letter is attached to this complaint as **Exhibit A**.  It states:

> We regret to inform you that we find it necessary to rescind our previous offer of employment for Customer Sales & Service Representative - Retail (LO) made on 08/06/2014.

> This offer is being rescinded due to information found through the background screening process. You will be contacted shortly by our vendor First Advantage by mail. This communication will provide you information regarding your options in response to the background screening results.

Ms. Muir was shocked, and could not imagine what her background report might contain that would cause Wells Fargo to rescind an offer of employment.

40.     Upon information and belief, the Wells Fargo September 5 letter is a standard form letter sent to any prospective employee similarly situated to Ms. Muir.

41.     Several days thereafter, Ms. Muir received a letter from First Advantage, containing the very first notice to Ms. Muir that Bank of America terminated her for internal fraud, that Bank of America had reported this to EWS, that EWS had disseminated this information to Wells Fargo, had advised Wells Fargo not to hire her, and that Wells Fargo indeed rescinded its offer of employment on that basis.  A portion of the letter Ms. Muir received from First Advantage is attached hereto as **Exhibit B**.

42.     Upon receiving and reviewing the First Advantage letter, Ms. Muir was shocked.

43.     Wells Fargo's September 5 letter to Ms. Muir reflects a final decision by Wells Fargo to rescind its offer of employment, and afforded Ms. Muir no opportunity to challenge, change, or influence the outcome of Wells Fargo's decision making process.

44.     By letter dated May 7, 2015 and sent by counsel via FedEx to EWS and First Advantage, Plaintiff disputed that she ever committed internal fraud while at Bank of America, and disputed the appearance of any such allegation in her consumer reports.

45.     By letter dated June 1, 2015, attached to this Complaint as **Exhibit C**, EWS responded to Plaintiff that it had conducted a reinvestigation into the disputed information in her file.  EWS

stated: "The reinvestigation confirms that you file contains information which is incomplete, inaccurate, or the accuracy of which cannot be verified."

## FCRA VIOLATIONS AS TO NAMED PLAINTIFF

*Failure to Maintain Accurate Reports*
*15 U.S.C. 1681e(b)*

46.    In violation of the FCRA, 15 U.S.C. 1681e(b), EWS and First Advantage failed to maintain reasonable processes to assure maximum possible accuracy of the background reports each furnished concerning Ms. Muir.

47.    Both EWS and First Advantage are credit reporting agencies as defined by the FCRA, and employee background reports, screening reports, or IFPS reports furnished by each entity are credit reports within the meaning of the FCRA.

48.    **EWS**.  The IFPS report furnished by EWS concerning Ms. Muir was false in stating Ms. Muir committed internal fraud at Bank of America.

49.    The false contents of the IFPS report furnished by EWS concerning Ms. Muir resulted from EWS's failure to maintain reasonable processes to assure the maximum possible accuracy of its IFPS reports.

50.    **First Advantage**.  The background report furnished by First Advantage to Wells Fargo concerning Ms. Muir was false in stating Ms. Muir committed internal fraud at Bank of America.

51.    The false contents of the First Advantage report furnished to Wells Fargo concerning Ms. Muir resulted from First Advantage's failure to maintain reasonable processes to assure the maximum possible accuracy of its employee background reports.

*Failure to Honor Pre-Adverse Action Rights*
*15 U.S.C. 1681b(b)(3)(A)*

52. **Wells Fargo** violated section 1681b(b)(3)(A) of the FCRA in that it determined to withdraw an offer of employment to Plaintiff on the basis of an IFPS report supplied by EWS, and screening report supplied by First Advantage, all without honoring Plaintiff's Pre-Adverse Action Rights.

53. The withdrawal of an offer of employment is adverse action within the meaning of the FCRA.

54. Wells Fargo took adverse action against Plaintiff on the basis of the IFPS report supplied by EWS, and the screening report supplied by First Advantage.

55. Prior thereto, Wells Fargo did not provide to Plaintiff a copy of the IFPS report, did not supply to Plaintiff a copy of her screening report supplied by First Advantage, and did not provide to Plaintiff written notice of her rights under the FCRA, all in violation of section 1681b(b)(3)(A) of the FCRA.

56. **EWS**, and/or **First Advantage**, took adverse action, against Plaintiff when making a determination to include in a report concerning Plaintiff: (i) a "Decision Message," stating, "Decline Applicant," and (ii) an elevated "severity" level of 100 concerning Plaintiff. The "Decision Message," to "Decline" Plaintiff, and the elevated "severity" level, were generated either by EWS, and/or by First Advantage, on the basis of internal analytics by one or both entities.

57. The determination to state "Decline Applicant" in a background report, and the determination to assign an elevated severity level to Plaintiff in a background report, is each "adverse action" within the meaning of the FCRA, because each such entry adversely affected Plaintiff for employment purposes by foreseeably causing Wells Fargo to rescind its offer of employment to her.

58.   Plaintiff was not supplied a copy of the screening report, including the "Decision Message" not to hire her, nor written notice of Plaintiff's rights under the FCRA, prior to September 5, 2014.

*Failure to Provide Clear and Conspicuous Disclosure*
*15 U.S.C. 1681b(b)(2)(A)*

59.   Section 1681b(b)(2)(A) requires that, before a consumer report is procured for employment purposes, the consumer must be given "clear and conspicuous" disclosure in a document that contains "solely the disclosure," and nothing else.

60.   Ms. Muir was not given disclosure consistent with section 1681b(b)(2)(A) of the FCRA in connection with the background screening process performed by First Advantage on behalf of Wells Fargo.  The First Advantage Internet portal, the only context in which Ms. Muir was given any purported disclosure regarding her consumer reports, contained no "clear and conspicuous" disclosure that her consumer reports might be used for pre-employment screening.  The only reference to any use of Ms. Muir's consumer report did not appear as the "sole[]" contents of the document, but rather, appeared together with a purported prospective waiver of FCRA rights.

61.   In violation of Section 1681b(b)(2)(A), Wells Fargo procured, or caused to be procured, Ms. Muir's background screening report from First Advantage, and Ms. Muir's IFPS report from EWS, all without appropriate disclosure.

62.   In violation of Section 1681b(b)(2)(A) of the FCRA, First Advantage procured Ms. Muir's IFPS report from EWS without appropriate disclosure.

*Failure to Assure Permissible Purpose*
*15 U.S.C. 1681e(a)*

11

63.     In violation of section 1681e(a) of the FCRA, EWS and First Advantage failed to maintain reasonable processes to assure that background reports concerning Plaintiff were used for permissible purposes.

64.     Section 1681b of the FCRA provides that credit reports may only used for the purposes listed therein, and for no other purposes.

65.     Under section 1681b of the FCRA, it is permissible to use a credit report for employment purposes, **subject to** appropriate disclosures to the employee, and the employee's Pre-Adverse Action Rights.  The use of a credit report for employment purposes absent required disclosures, or in a manner violating employee Pre-Adverse Action Rights, is not a permissible purpose for use of a credit report.

66.     EWS furnished an IFPS report to First Advantage, and indirectly to Wells Fargo, for the purpose of using the IFPS report for employment purposes without required disclosures, and in violation of Ms. Muir's Pre-Adverse Action Rights.

67.     It would have been reasonable for EWS to require, but EWS failed to require, that: (i) Wells Fargo provide adequate disclosures to consumers regarding the use of employee background reports, including IFPS reports, for employment purposes; (ii) Wells Fargo honor employee Pre-Adverse Action Rights.

68.     First Advantage furnished to Wells Fargo an employee screening report concerning Ms. Muir for the purpose of using the screening report without required disclosures and in violation of Ms. Muir's Pre-Adverse Action Rights.

69.     It would have been reasonable for First Advantage to require or to ensure, but First Advantage failed to require and failed to ensure: (i) that Wells Fargo provide appropriate

disclosure to Plaintiff as a condition for furnishing its background report to Wells Fargo concerning Plaintiff; and (ii) Wells Fargo honor employee Pre-Adverse Action Rights.

*Willfulness of Violations*

70.   All FCRA violations alleged herein were committed willfully.  All Defendants alleged to have violated the FCRA have extensive knowledge of the FCRA, its requirements with respect to employee background reports, and case-law and regulatory guidance interpreting and implementing the FCRA.

71.   All Defendants had, or should have had, knowledge of the FCRA violations alleged in the action brought in the United States Court for the Eastern District of Virginia, styled *Manuel v. Wells Fargo Bank, National Association*, index number 3:14-cv-238.  It is egregious that Defendants continued to commit FCRA violations against Plaintiff and class members even after receiving notice of the *Manuel* suit.

72.   Moreover, it is EWS's purpose, and the effect of its actions, to maximize the number of employees on its IFPS database, even if the allegations against such employees are tenuous. Minimal to moderate over-reporting of employees for internal fraud is relatively costless to EWS and its participating financial institutions, whereas under-reporting of employee internal fraud would diminish the effectiveness of the IFPS service.  EWS knowingly and intentionally errs on the side of practices and procedures which result in over-reporting of employees for internal fraud.

73.   For EWS to involve the accused employee would impose costs on its business model, complications in verifying allegations against the employee, and reduce the number of employees in its IFPS database.  EWS purposefully seeks to minimize employee involvement, or opportunities for employees to dispute their listing on the IFPS database.

74.    EWS seeks to minimize its visibility to employees or prospective employees, and thereby reduce the likelihood that consumers will dispute the contents of IFPS reports.   EWS intentionally, or recklessly, does not reasonable procedures to require that clear and conspicuous disclosure is given to employees that their IFPS report might be used for employment purposes.

*Actual Damages*

75.    Defendants' violations of the FCRA caused Ms. Muir damages.

76.    Plaintiff could have, and would have, disputed the false accusation of fraud had she been provided appropriate notice and disclosures, and had her Pre-Adverse Action Rights been honored.

77.    Defendants' violations of the FCRA caused Ms. Muir to lose a valuable employment opportunity at Wells Fargo, and to negatively alter her career trajectory.

78.    Defendants' violations of the FCRA caused Ms. Muir to abandon her job-search in her chosen professional field.

79.    Defendants' violations of the FCRA caused Ms. Muir to suffer personal financial hardship and adverse personal credit events.

80.    Defendants' violations of the FCRA caused Ms. Muir to suffer anguish and emotional distress, and a sense of helplessness caused by a wrongful accusation of fraud and its dissemination among prospective employers.

## SHERMAN ACT VIOLATIONS

*Overview*

81.    In operating its IFPS service, EWS, together with a market-wide network of financial institutions, unreasonably shuts employees out of the market for employment at financial

institutions, or an identifiable segment thereof, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

82.   An employee reported to EWS for internal fraud cannot obtain a job in the market for employment at financial services institutions, or an identifiable segment thereof.   Such employees are effectively blacklisted.

83.   Moreover, a market-wide agreement to exchange information is unlawful where, as here, the exchange has unreasonable anti-competitive effects.   A Sherman Act "violation lies in the information exchange itself."   *Todd v. Exxon*, 275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.).

84.   EWS seeks, by and through the IFPS system, to "obtain a single view of fraud activity across the enterprise," as EWS described on its website.   A market-wide network to "obtain a single view" of alleged employee misconduct is fundamentally unfair to the accused employee.

85.   EWS could, but does not, take steps to reduce the exclusionary effects of its market-wide information-sharing network.   Like EWS, networks in other markets share information for the purpose of preventing fraud on a market-wide basis, but unlike EWS, these networks implement safeguards to protect against unreasonably exclusionary conduct.

*The Relevant Market*

86.   IFPS constitutes an unreasonable restraint of trade in the market for employment at financial institutions nationwide, or an identifiable segment thereof.   Employment at financial institutions constitutes a discrete and identifiable market.   A person with employment experience at a financial institution, or training for such employment, would incur costs or hardship in seeking to shift to a new career, and could not easily substitute a job in financial services with a job in another field.

87.  The relevant market may be an identifiable segment within the market for employment at financial institutions generally, and may be limited to the market for employment at banks, the market for employment at bank branches, or the market for employment in banking positions which involve access to cash, accounts, or account and other sensitive information. An employee with experience, skills, eligibility and training for any such position of employment would incur cost or hardship in shifting to employment outside the relevant market.

88.  Financial institutions, in seeking prospective employees, look favorably on those employees with experience, training, and education suited for the positions they seek to fill.

89.  Financial institutions compete with each other in setting employee compensation, benefits, and other terms of employment; financial institutions do not compete, or only compete to a lesser extent, with non-financial institutions in attracting and retaining employees. For example, JPMorgan Chase & Co. states in its most recent annual report, filed on form 10-K with the Securities and Exchange Commission: "JPMorgan Chase's employees are the Firm's most important resource, and in many areas *of the financial services industry*, competition for qualified personnel is intense" (emphasis added). Wells Fargo & Co. states in its most recent annual report: "The success of Wells Fargo is heavily dependent on the talents and efforts of our team members, and in many areas of our business, including the commercial banking, brokerage, investment advisory, and capital markets businesses, the competition for highly qualified personnel is intense."

90.  Financial institutions perceive themselves as constituting an identifiable market with respect to employment, recruitment of employees, and background screening of employees. Indeed, EWS itself is narrowly focused on the financial industry, and IFPS is narrowly targeted to

the financial industry, or a segment thereof.  The IFPS service does not offer screening systems for "employee theft" generically at non-financial employers.

91.  Financial institutions are governed by unique sets of laws and regulations not generally applicable to other industries.  Such laws and regulations pertain in certain respects to employee screening and employment practices.

*Collaboration at EWS*

92.  It is the very essence of EWS that financial institutions collaborate.  EWS marks as a service mark on its website: "Creating Value Through Collaboration."

93.   EWS seeks to combat fraud by orchestrating market-wide collaboration.  As of October 2014, EWS stated on its website on the Internet (www.earlywarning.com/about2.html) (emphasis added):

> EWS is owned by "Bank of America, BB&T, Capital One, JPMorgan Chase, and Wells Fargo.  Those financial institutions - as well as hundreds of others across the country - *exchange information and knowledge to obtain a single view of fraud activity across the enterprise* and manage fraud on a cross-institution basis.  Early Warning facilitates this secure exchange between these organizations . . . We provide our customers with fraud and risk management tools through collaboration and sharing of information within the industry.

A screen shot of the above language on the EWS website is attached hereto as **Exhibit D**. EWS has since removed the language from its website.

94.  EWS further states on its website (emphasis added): "Owned and governed by five of the largest banks in the United States, our unique business model *facilitates a data exchange system based on collaborative intelligence and trusted exchange*."  Similar language appears elsewhere on EWS's website: "For more than 20 years, Early Warning has facilitated

a trusted data exchange to help organizations fight fraud, reduce operational costs and enhance customer service."

95.    EWS further states on its website (emphasis added):

> Early Warning provides innovative risk management solutions to a diverse network of 2,100 financial institutions, government entities and payment companies, enabling businesses and consumers to transact with safety, speed, and convenience. Owned and governed by five of the largest banks in the United States, ***this unique business model facilitates a data exchange system based on collaborative intelligence and trusted exchange***.

96.    EWS posts a "Corporate Overview" on its website, which includes the following statements:

> [EWS's] suite of proprietary solutions use collaborative data – contributed by an array of financial services organizations, large and small – and advanced analytical modeling to secure the global financial services system. . . .

> Each day hundreds of FSOs [*i.e.*, Financial Services Organizations,] contribute timely, accurate and relevant transactional data. Early Warning serves as custodian to this immense database, which reflects the activity of approximately 50 percent of the country's eligible banking population.

97.    EWS's website goes on to state, "Early Warning's one-of-a-kind business model enables a trusted exchange between like-minded organizations that contribute data to fuel Early Warning's fraud prevention and risk management solutions."

*Origins of IFPS*

98.    The IFPS service as offered today by EWS was first conceived as an industry-wide response to internal fraud by the Financial Services Roundtable ("FSR").  FSR is the leading trade and industry group representing the financial industry in the United States, and has existed for more than 100 years.

99.   BITS is the Technology Policy Division of FSR.[1]  BITS conducts itself and its affairs by and through its members, committees, advisors, and others, as disclosed by BITS on its website, as set forth in **Exhibit E** attached hereto.  BITS offers a description of its work on its website maintained on the Internet.  BITS was created to allow its members to "collaborate on key technology issues."  Over time, "the concept of collaboration [expanded] beyond BITS core membership to collaboration with other associations."  A key focus of BITS is fraud prevention across the financial services industry.  As BITS states on its website, "BITS continues to address newly emerging threats and opportunities, particularly those related to cybersecurity, fraud reduction and critical infrastructure protection."

100.  In or prior to 2006, BITS conceived of a national database containing records of all employees at banking or financial institutions who were discharged for internal fraud.  BITS further contemplated that the identities of all such employees be shared with any employer or prospective employer in the financial services market.  BITS's purpose was fraud prevention: An employee discharged for stealing from "Bank A," should not seek employment at "Bank B" and repeat the fraud.

101.  BITS's scheme resulted in a national database, known as the national Internal Fraud Prevention Service database (the "IFPS Database").

102.  BITS determined that the IFPS Database, and industry-wide services provided in connection therewith, be managed, maintained, and operated by EWS.  As EWS explains on its website: "After extensive research on the feasibility exchanging fraudulent employee information, the BITS Fraud Reduction Steering Committee and the BITS Shared Database Working Group

---

[1] BITS is not an acronym.  Historically, the term once stood for "Banking Industry Technology Secretariate," but BITS and the FSR no longer consider that phrase appropriate, as BITS does not uniquely serve the *banking* industry, but rather, supports banking, insurance, securities, and other financially integrated services providers.

chose Early Warning Services to build and manage this service." To this day, EWS notes on its website that the "Internal Fraud Prevention service was… sponsored by BITS."

*Collaboration in the IFPS System*

103. The IFPS system is ***a network of agreements*** by and among participating financial institutions, each individually with EWS, all implicitly with each other, to furnish and share information regarding allegations of employee internal fraud, in accordance with the requirements and Operating Rules promulgated by EWS.

104. EWS promotes the IFPS system as a collaborative and industry-wide system for combating fraud on a cross-institutional basis. Each financial institution participating in IFPS does so with the knowledge, and intent, that allegations of employee fraud it furnishes to EWS will be disseminated to other participants in the IFPS network, and conversely, that it will be the beneficiary of all reports of employee fraud furnished by any other participating financial institution.

105. As a condition to participating in the IFPS network, upon information and belief, financial institutions are required by EWS to enter into binding agreements governing their IFPS participation, and are required to adhere to the IFPS Operating Rules.

106. As a condition to receiving IFPS reports, upon information and belief, financial institutions are required to commit that they will furnish to EWS reports of any cases of employee internal fraud arising at their own institution, thereby expanding and cementing EWS's information-sharing network.

107. Each participating institution enters into an IFPS agreement with EWS *because* of the market-wide conspiracy. No single participant in the scheme would reap any of its benefits,

nor commit to its costs, but for the participation of financial institutions market-wide as facilitated by EWS.

108. Upon information and belief, institutions which furnish allegations of employee internal fraud to EWS are provided financial benefits where that information is used to deny employment to that employee at another financial institution.  By way of example, as set forth on **Exhibit F** attached hereto, an employee screening firm which offers EWS's IFPS service, advertises on the internet:

> **Financial institution collaboration and revenue-sharing**
> — Your institution receives a financial benefit from Early Warning when your contributed data helps another institution prevent a loss.

109. At the time EWS was selected by BITS to maintain and manage the IFPS database and related networking system, the banks or bank holding companies who owned and managed EWS controlled a significant share of the market for employment at financial institutions in the United States.  These banks or bank holding companies, collectively, employed hundreds of thousands of employees or more, operated thousands of bank branches, held trillions of dollars in deposits and assets, and dominated banking and financial services markets throughout the United States.

*The Unreasonableness of the Restraint*

110. The collaboration that is IFPS, as operated by EWS, is felt by any employee reported for internal fraud.  Any such employee is effectively blacklisted from employment across the financial services market, or a material segment thereof.

111. The IFPS restraint may take either or both of the following forms:

(a)     IFPS may constitute an implicit or explicit agreement, between participating financial institutions and EWS, and with each other, not to hire any employee reported for internal fraud.

(b)     Alternatively, in the IFPS system, a Sherman Act "violation lies in the information exchange itself." *Todd v. Exxon*, 275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.).   Regardless of whether financial institutions agree not to hire accused employees, the mere act of sharing sensitive employee information, without reasonable safeguards, has anticompetitive effects.

112.   The IFPS system is unreasonable specifically in that:

(a)     Any financial institution contributing reports of internal fraud should provide employees, at the time accusations are made against them, written notice of the allegations of fraud, the opportunity to dispute the same, and the opportunity to include a statement of dispute on EWS's IFPS background report.

(b)     EWS should require, but fails to require, that any institution reporting an employee for internal fraud certify that it has taken the steps described immediately above.

(c)     IFPS reports of internal fraud are not subject to adequate third-party auditing to assure basic levels of quality and accuracy;

(d)     EWS shares IFPS reports of alleged internal fraud without the employee's consent, indeed, without the employee even knowing that EWS exists.

(e)     EWS takes an affirmative role in making determinations negatively impacting employment decisions.

113. Lower level employees at financial institutions are routinely subjected to false allegations of fraud by other employees with wrongful and ulterior motives.  By way of example, a branch manager may wrongly report a teller for internal fraud for no reason other than to open-up the position for a friend.

114. Routine and common discrepancies in accounts or reporting for which tellers are responsible can be used by other employees, including branch or compliance managers, to substantiate a false allegation of fraud against an innocent teller.  EWS, and financial institutions participating in the IFPS system, lack adequate controls to prevent such false allegations of internal fraud from entering IFPS background reports.

115. It would be reasonable for EWS to require that accused employees receive notice of alleged internal fraud and the opportunity to be heard.  Other employee background screening services impose similar, or even more stringent, requirements.  LexisNexis Screening Solutions, Inc. ("LexisNexis") offers a proprietary system called "Esteem," which, like IFPS, collects information regarding internal employee theft.  Esteem provides employee background screening on the basis of the database it maintains of reported employee thefts. The Esteem service is not targeted specifically to financial institutions.

116. Unlike IFPS as operated by EWS, upon information and belief, LexisNexis requires that any business supplying the name of an employee accused of internal theft, either: (i) supply a signed statement of admission by the subject employee, or (ii) have the matter referred to criminal prosecution.  In this way, LexisNexis assures a basic level of accuracy in the names which are reported to it for alleged internal employee theft.  Upon information and belief, EWS imposes no comparable obligation on financial institutions reporting employees for alleged internal fraud as part of its IFPS system.

117. The Federal Trade Commission has observed that networks designed to share information across a market, as a fraud-prevention program, may be susceptible of "concerted misuse," in violation antitrust laws.  In July 2010, a consortium of pharmaceutical companies sought an advisory opinion from the Federal Trade Commission Bureau of Competition regarding antitrust compliance of the International Pharmaceutical Supply Chain Consortium ("Rx-360").  Rx-360 involved, in part, sharing information across the pharmaceutical market regarding suppliers of counterfeit goods, in an attempt to reduce fraud across the market.

118. Rx-360 included numerous safeguards which, the FTC observed, would protect against unreasonable exclusionary conduct, or "possible concerted misuse," giving rise to antitrust violations.  See **__Exhibit G__** p. 8.  EWS could, but fails to, adopt similar safeguards to protect against unreasonable exclusionary conduct against employees.

(a) Rx-360 provided for adequate notice and consent among those alleged to have committed wrongdoing; in contrast, EWS does not require notice to accused employees, does not provide them an opportunity to be heard, and lacks adequate controls for employee consent before sharing IFPS reports .

(b) Rx-360 provided for third-party auditing, where the IFPS system lacks adequate auditing.

(c) Rx-360 provided that the joint-venture at the center of the information-sharing network take no active role in determining violations; in contrast, upon information and belief, EWS takes an affirmative role in issuing a "Decision Message" to hire or not hire an employee, and issuing a "severity" level regarding the employee.

119.    The IFPS System denies employment to a much wider group of people than would be required under Section 19 of the Federal Deposit Insurance Act, which prohibits banks from employing persons **convicted** of certain criminal offenses, or those who have entered a diversion or similar program regarding prosecution for certain criminal offenses.

120.    Financial institutions participating in the IFPS system agree to so participate with knowledge of those aspects of the IFPS system alleged herein to be unreasonable.

*Sherman Act Violations as to Named Plaintiff*

121.    As alleged more fully above, Bank of America reported to EWS that plaintiff committed internal fraud; EWS furnished that information, directly or indirectly, to Wells Fargo; and on the basis of that information, Plaintiff was denied employment.

122.    Plaintiff sought employment within the relevant market, and was shut out of the market by means of the unreasonable restraint of trade cause and constituted by the IFPS system maintained by EWS.

123.    The unreasonable restraint was caused by one or more agreements, including between: EWS and Bank of America; EWS and Wells Fargo; and implicitly, EWS's agreements with those financial institutions participating in the IFPS system.

124.    Had EWS and Bank of America acted reasonably, Plaintiff would not have been shut out of the relevant market for employment.  Specifically, EWS and Bank of America acted unreasonably in disseminating an allegation of internal fraud against Plaintiff, while:

(a) Bank of America failed to provide Plaintiff written notice of the allegations of internal fraud, the opportunity to dispute the same, and the opportunity to include a statement of dispute on EWS's IFPS background report.

(b) EWS failed to require that Bank of America take the steps described immediately above.

(c) Bank of America's allegation that Plaintiff committed internal fraud was not subject to adequate third-party auditing to assure basic levels of quality and accuracy;

(d) EWS shared an IFPS report of alleged internal fraud regarding Plaintiff without Plaintiff's consent, indeed, without Plaintiff even knowing that EWS exists.

(e) EWS took an affirmative role in making determinations negatively impacting employment decisions regarding Plaintiff.

125.  As a consequence thereof, Plaintiff suffered damages.

## CLASS ACTION ALLEGATIONS

126.  Counts 4, 5, 7,8, and 10 of this action are brought as nationwide class actions pursuant to Rule 23 of the Federal Rules of Civil Procedure.

127.  Each of the classes in this action is nationwide in scope, consisting of all consumers within the class definition who reside in the United States or its territories.

128.  The class period for the Sherman Act Class is four years prior to the date of the filing of this action, and for all remaining classes, is five years prior to the date of the filing of this action. All classes are ongoing.

129.  Excluded from each of the classes are all employees, officers, and directors of each of the named defendants to this action; all persons in bankruptcy;  all counsel appearing in this action; the honorable judge presiding over this action; and all persons who, individually or as class members, have entered into a previous settlement agreement releasing the class claims alleged herein.

130. No difficulties are foreseen in maintaining any of the Class Action Counts as class actions. Named Plaintiff is prepared to represent class members as to each of the class actions, and has retained competent and experienced counsel to pursue the class claims.  Named Plaintiff's interests are not adverse or antagonistic to those of the members of any Classes.

131. As applicable to each of the class counts, prospective employees of Wells Fargo were directed to a portal maintained on the Internet by First Advantage, where prospective employees filled out various forms submitted to First Advantage, and where First Advantage purported to give various disclosures.

132. The screening process for each Wells Fargo employee or prospective employee, including the First Advantage Internet portal, was identical in all material respects.

133. Upon information and belief, Wells Fargo employees and prospective employees were given no disclosures relevant to the FCRA other than as provided by the First Advantage Internet portal.

134. All employee screening reports furnished by First Advantage to Wells Fargo are consumer reports as defined by section 1681a(d)(1)(B) of the FCRA, and were furnished "for employment purposes," as defined by section 1681a(h) of the FCRA.

135. Employee screening reports furnished by First Advantage to Wells Fargo do not pertain to any preexisting investigation into the subject employee.  Such reports are furnished pursuant to standard and routine practice for financial institutions applied to all employees and prospective employees.

136. All IFPS background reports furnished by EWS are consumer reports as defined by section 1681a(d)(1)(B) of the FCRA, and all such reports furnished to First Advantage are for purposes of employment as defined by section 1681a(h) of the FCRA.  IFPS reports are

27

"consumer reports," regardless of whether such reports reflect that an employee is accused of wrongdoing. An IFPS report stating that no institution has accused an employee of wrongdoing is nevertheless a consumer report.

137. EWS records each time a prospective employee is denied employment *because of* a report it furnishes, and has boasted that there are thousands such would-be employees.

138. IFPS reports provided by EWS to First Advantage for standard employee background screening do not pertain to any preexisting investigation into the subject employee.

## COUNT I

## FAILURE TO MAINTAIN ACCURATE REPORT, 15 U.S.C. 1681e(b)

## INDIVIDUAL CLAIM AGAINST EWS

139. All preceding paragraphs are re-alleged.

140. Count I is brought by Plaintiff individually, and not on behalf of any class, against EWS.

141. EWS failed to maintain reasonable processes to assure maximum possible accuracy of a consumer report concerning Plaintiff.

142. As a consequence thereof, a consumer report concerning Plaintiff, specifically an IFPS report, furnished by EWS to First Advantage, contained inaccurate information concerning Plaintiff, specifically in stating Plaintiff committed "internal fraud" while an employee of Bank of America.

143. Plaintiff suffered actual damages as a consequence thereof.

144. EWS's conduct violated section 1681e(b) of the FCRA.

## COUNT II

## FAILURE TO MAINTAIN ACCURATE REPORT, 15 U.S.C. 1681e(b)

## INDIVIDUAL CLAIM AGAINST FIRST ADVANTAGE

145. All preceding paragraphs are re-alleged.

146. Count II is brought by Plaintiff individually, and not on behalf of any class, against First Advantage.

147. First Advantage failed to maintain reasonable processes to assure maximum possible accuracy of a consumer report concerning Plaintiff.

148. As a consequence thereof, a consumer report concerning Plaintiff, specifically an employee screening background report, furnished by First Advantage to Wells Fargo, contained inaccurate information concerning Plaintiff, specifically in stating Plaintiff committed "internal fraud" while an employee of Bank of America.

149. Plaintiff suffered actual damages as a consequence thereof.

150. First Advantage's conduct violated section 1681e(b) of the FCRA.

## COUNT III

## VIOLATION OF PRE-ADVERSE ACTION RIGHTS, 15 U.S.C. 1681b(b)(3)(A)
## INDIVIDUAL CLAIM AGAINST WELLS FARGO

151. All preceding paragraphs are re-alleged.

152. Wells Fargo used a background screening report furnished by First Advantage, and an IFPS report furnished by EWS, to take adverse action against Plaintiff with respect to employment.

153. Based upon these consumer reports, Wells Fargo withdrew an offer of employment it had extended to Plaintiff.

154. Wells Fargo failed, prior to taking adverse action against Plaintiff, to furnish her with a copy of the consumer reports based upon which it took adverse action.

155. Wells Fargo failed, prior to taking adverse action against Plaintiff, to furnish her with written notice of her rights under the FCRA.

156. Wells Fargo violated Section 1681b(b)(3)(A) of the FCRA.

## COUNT IV

**VIOLATION OF PRE-ADVERSE ACTION RIGHTS, 15 U.S.C. 1681b(b)(3)(A)**

**CLASS ACTION CLAIM AGAINST EWS AND/OR FIRST ADVANTAGE**

157.   All preceding paragraphs are re-alleged.

158.   Count IV is brought by Plaintiff for herself and the Count IV Class against EWS and/or First Advantage.   Count IV alleges violations of Section 1681b(b)(3)(A) of the FCRA.

159.   The Count IV class is defined as:

> All natural persons who were the subject of a First Advantage employee background report furnished to Wells Fargo for purposes of standard employee screening, were such report reflects First Advantage made an inquiry to EWS and in connection therewith such report contains either: (i) any instruction or message to not employ such persons, or (ii) a "severity" level with respect to such person of 100 or more, and, in either case, where such person was not provided, before such time as the background report was furnished to Wells Fargo, both: (x) a copy of the background report and (y) a description in writing of the persons's rights prescribed by the Bureau of Consumer Financial Protection pursuant to section 1681g(c)(1) of the FCRA.

160.   Each and every IFPS report furnished by EWS to First Advantage is a "consumer report" within the meaning of the FCRA, and each such report is furnished for "employment purposes" as defined by the FCRA.   Each and every First Advantage background screening report furnished to Wells Fargo is a "consumer report" within the meaning of the FCRA, and each such report is furnished for "employment purposes" as defined by the FCRA.

161.   EWS, and/or First Advantage takes "adverse action" within the meaning of the FCRA, by making a determination on the basis of internal analytics: (i) to include an instruction or message in a background report not to employ the person who is the subject of the report; or (ii) to report a "severity" level of 100 or more regarding the person who is the subject of the report.   Any such determination is adverse to the interests of the person who is the subject of the report, and foreseeably causes such a person to lose employment, or to lose more advantageous terms of employment than would otherwise be enjoyed.

30

162. Any adverse action taken as described immediately above is "based in whole or in part" on the contents of a consumer report, specifically the IFPS report EWS furnishes.

163. IFPS reports furnished by EWS, and background screening reports furnished by First Advantage, are standard form documents, materially identical to each other insofar as relevant to the class claims.

164. EWS and First Advantage maintain standardized and automated protocols for disclosure procedures to employees and prospective employees, materially identical in all cases with respect to the FCRA allegations set forth above, including with regard to pre-adverse action disclosure.

165. **Numerosity**.  Upon information and belief, EWS has furnished thousands of IFPS reports which come within the definition of the class, and/or First Advantage has furnished thousands of employee background reports that come within the definition of the class. Joinder of class claims is impossible or impractical.

166. **Ascertainable**.  The class is ascertainable.  EWS maintains records of all IFPS reports it furnishes to First Advantage; First Advantage maintains records of all IFPS reports it receives from EWS; First Advantage maintains records of all background reports it furnishes to Wells Fargo; and Wells Fargo maintains records of all reports it receives from First Advantage.  All such records including the contents of such reports, the purposes for which they were obtained, the persons to whom such reports were furnished, and date on or about which such reports were furnished to third parties.

167. **Typicality**.  Named Plaintiff's claims are typical of those of class members.  As set forth more fully above, named plaintiff was the subject of a First Advantage report reflecting, in

connection with IFPS report, a message not to employ Plaintiff, and a "severity" level regarding Plaintiff of 100.

168. **Predominance**. Common questions of law and fact arise with respect to all class members, and predominate the class action.

169. **Superiority**. A class action is a superior method of adjudicating the claims brought by the class. Many class members are unaware of the violations of law perpetrated against them, and statutory and actual damages to which class members are entitled are such that retaining counsel and litigating claims individually would prove overly burdensome on parties, counsel and the courts. Moreover, individual actions litigating the claims alleged herein could lead to inconsistent results.

## COUNT V
### FAILURE TO PROVIDE CLEAR AND CONSPICUOUS DISCLOSURE
### 15 U.S.C. 1681b(b)(2)(A)
### CLASS ACTION CLAIM AGAINST FIRST ADVANTAGE

170. All preceding paragraphs are re-alleged.

171. Count V is brought by Plaintiff for herself and the Count V Class, against First Advantage. Count V alleges First Advantage failed to provide required disclosure of the use of consumer reports for employment purposes, in violation of the FCRA.

172. The Count V Class consists of:

All consumers who sought employment with Wells Fargo, and in connection therewith: (i) were directed the First Advantage Internet portal for employee screening purposes; and (ii) received no disclosures regarding use of consumer reports for employment purposes with Wells Fargo, other than by means of the First Advantage Internet portal; and (iii) were the subject of a First Advantage employee background report, where such report reflects EWS furnished an IFPS report to First Advantage concerning that consumer.

173. During the class period, Wells Fargo outsourced to First Advantage its pre-employment background screening.  Wells Fargo referred prospective employees to a portal maintained on the Internet by First Advantage, where prospective employees were purportedly given disclosure regarding the use of any consumer reports for purposes of employment, and where prospective employees were asked to consent the use of consumer reports for such purposes.

174. Upon information and belief, Wells Fargo relied on First Advantage to provide any and all required FCRA disclosures to prospective employees, and to obtain any consent from prospective employees required by the FCRA.  No disclosures were provided to prospective employees, and no purported consent was obtained from prospective employees, other than by means of the First Advantage Internet portal.

175. The First Advantage Internet portal failed to disclose to prospective employees in a clear and conspicuous manner that IFPS reports furnished by EWS would be obtained by First Advantage and used for employment purposes, as required by section 1681b(b)(2) of the FCRA.

176. Each and every IFPS report concerning a prospective Wells Fargo employee obtained by First Advantage is a consumer report within the meaning of the FCRA.  Each such report procured by First Advantage was procured for employment purposes within the meaning of the FCRA.

177. The First Advantage Internet portal for pre-employment screening consists of standardized forms substantially identical as to all class members with respect to the FCRA violations alleged above.

178. **Numerosity**.  Upon information and belief, First Advantage has procured thousands of background reports which come within the class definition.  Joinder of claims is impossible or impractical.

179. **Ascertainable**.  The class is ascertainable.  First Advantage maintains records of all background reports it furnishes, including the contents of such reports, the persons to whom such reports are furnished, and date on or about which such reports are furnished to third parties.

180. **Typicality**.  Named Plaintiff's claims are typical of those of class members.  As set forth more fully above, named plaintiff was the subject of First Advantage background report which reflects an IFPS report was furnished to First Advantage for employment purposes, and named Plaintiff was not provided disclosure of this, in advance, as required by section 1681b(b)(2)(A) of the FCRA.

181. **Predominance**.  Common questions of law and fact arise with respect to all class members, and predominate in each of the class actions.

182. **Superiority**.  A class action is a superior method of adjudicating the claims brought by the class.  Many class members are unaware of any violations of law perpetrated against them by First Advantage, and statutory and actual damages to which class members are entitled are such that retaining counsel and litigating claims individually would prove overly burdensome on parties, counsel and the courts.  Moreover, individual actions litigating the claims alleged herein could lead to inconsistent results.

## COUNT VI
## FAILURE TO PROVIDE CLEAR AND CONSPICUOUS DISCLOSURE
## 15 U.S.C. 1681b(b)(2)(A)
## INDIVIDUAL CLAIM AGAINST WELLS FARGO

183. All preceding paragraphs are re-alleged.

184. Count VI is brought by Plaintiff individually, and not on behalf of any class, against Wells Fargo.

185. Wells Fargo procured, or caused to be procured, a consumer report concerning Plaintiff for employment purposes, specifically a background screening report from First Advantage and an IFPS report from EWS.

186. Wells Fargo failed to provide a clear and conspicuous disclosure to Plaintiff, in a document that consisted solely of such disclosure, that it would procure or cause to be procured Plaintiff's consumer reports for employment purposes.

187. Wells Fargo violated section 1681b(b)(2)(A) of the FCRA.

## COUNT VII
## FAILURE TO ASSURE PERMISSIBLE PURPOSE, 15 U.S.C. 1681e(a)
## CLASS ACTION CLAIM AGAINST FIRST ADVANTAGE

188. All preceding paragraphs are re-alleged.

189. Count VII is brought by Plaintiff for herself and on behalf of the Count VII Class, against First Advantage.  The Count VII Class consists of:

> All consumers who sought employment with Wells Fargo, and in connection therewith were the subject of a First Advantage employee background report furnished by First Advantage to Wells Fargo, where any purported disclosure to such consumer regarding the use of consumer reports for employment purposes was provided by means of the First Advantage employment screening portal maintained on the Internet.

190. During the class period, Wells Fargo outsourced to First Advantage its pre-employment background screening.  Wells Fargo referred prospective employees to a portal maintained on the Internet by First Advantage, where prospective employees were purportedly given disclosure regarding the use of any consumer reports for purposes of employment, and where prospective employees were asked to consent the use of consumer reports for such purposes.

35

191. No disclosures were provided to prospective Wells Fargo employees, and no purported consent was obtained from prospective employees, other than by means of the First Advantage Internet portal.

192. The First Advantage Internet portal failed to disclose to prospective employees in a clear and conspicuous manner that Wells Fargo might procure, or cause to be procured, a consumer report concerning the prospective employee, specifically a First Advantage background screening report, from First Advantage.

193. Each and every First Advantage background screening report concerning a prospective Wells Fargo employee furnished by First Advantage to Wells Fargo is a consumer report within the meaning of the FCRA. Each such report was furnished for employment purposes within the meaning of the FCRA.

194. The First Advantage Internet portal for pre-employment screening consists of standardized forms substantially identical as to all class members with respect to the FCRA violations alleged above.

195. Wells Fargo's use of each such employee background report furnished by First Advantage for employment purposes was not a permissible use of the consumer report. A consumer report may only be permissibly used for employment purposes subject to, and conditioned upon, appropriate disclosure required by Section 1681b(b)(2)(A) of the FCRA. Such disclosure was absent as to all class members.

196. First Advantage failed to have reasonable processes to assure that its employee background reports were used solely for permissible purposes.

197.   **Numerosity**.   Upon information and belief, First Advantage has furnished thousands of employee background reports to Wells Fargo which come within the class definition.  Joinder of claims is impossible or impractical.

198.   **Ascertainable**.   The class is ascertainable.   First Advantage maintains records of all background reports it furnishes, including the contents of such reports, the persons to whom such reports are furnished, and date on or about which such reports are furnished to third parties.

199.   **Typicality**.   Named Plaintiff's claims are typical of those of class members.  As set forth more fully above, named plaintiff was the subject of First Advantage background report fursnihed to Wells Fargo for employment purposes, and named Plaintiff was not provided appropriate disclosure of this, in advance, as required by section 1681b(b)(2)(A) of the FCRA.

200.   **Predominance**.  Common questions of law and fact arise with respect to all class members, and predominate in each of the class actions.

201.   **Superiority**.  A class action is a superior method of adjudicating the claims brought by the class.  Many class members are unaware of any violations of law perpetrated against them by First Advantage, and statutory and actual damages to which class members are entitled are such that retaining counsel and litigating claims individually would prove overly burdensome on parties, counsel and the courts.  Moreover, individual actions litigating the claims alleged herein could lead to inconsistent results.

**COUNT VIII**

**FAILURE TO ASSURE PERMISSIBLE PURPOSE, 15 U.S.C. 1681e(a)**

**CLASS ACTION CLAIM AGAINST EWS**

202.   All preceding paragraphs are re-alleged.

203. Count VIII is brought by Plaintiff for herself and on behalf of the Count VIII Class, against EWS.  The Count VIII Class consists of:

> All consumers who sought employment with Wells Fargo, and in connection therewith were the subject of a First Advantage employee background report, where: (i) such report reflects EWS furnished an IFPS report to First Advantage concerning that consumer; and (ii) any purported disclosure to such consumer regarding the use of consumer reports for employment purposes was provided by means of the First Advantage employment screening portal maintained on the Internet.

204. During the class period, Wells Fargo outsourced to First Advantage its pre-employment background screening.  Wells Fargo referred prospective employees to a portal maintained on the Internet by First Advantage, where prospective employees were purportedly given disclosure regarding the use of any consumer reports for purposes of employment, and where prospective employees were asked to consent the use of consumer reports for such purposes.

205. No disclosures were provided to prospective Wells Fargo employees, and no purported consent was obtained from prospective employees, other than by means of the First Advantage Internet portal.

206. The First Advantage Internet portal failed to disclose to prospective employees in a clear and conspicuous manner, and in a document consisting solely of the disclosure, that IFPS reports might be obtained from EWS for employment purposes.  The use of any class member's IFPS report, which, under the FCRA is a consumer report, for employment purposes by First Advantage or Wells Fargo was not a permissible purpose under the FCRA.

207. EWS failed to have reasonable processes to assure that its IFPS reports were used solely for permissible purposes, in violation of Section 1681e(a) of the FCRA.

208. **Numerosity**.  Upon information and belief, EWS has furnished thousands of employee background reports to First Advantage which come within the class definition.  Joinder of claims is impossible or impractical.

209. **Ascertainable**.  The class is ascertainable.  EWS maintains records of all background reports it furnishes, including the contents of such reports, the persons to whom such reports are furnished, and date on or about which such reports are furnished to third parties.

210. **Typicality**.  Named Plaintiff's claims are typical of those of class members.  As set forth more fully above, named plaintiff was the subject of an IFPS report furnished by EWS to First Advantage, after proceeding through the First Advantage Internet portal for Wells Fargo employee pre-screening.

211. **Predominance**.  Common questions of law and fact arise with respect to all class members, and predominate the class action.

212. **Superiority**.  A class action is a superior method of adjudicating the claims brought by the class.  Many class members are unaware of any violations of law perpetrated against them by First Advantage, and statutory and actual damages to which class members are entitled are such that retaining counsel and litigating claims individually would prove overly burdensome on parties, counsel and the courts.  Moreover, individual actions litigating the claims alleged herein could lead to inconsistent results.

## COUNT IX
## FAILURE TO FURNISH REQUESTED REPORT, 15 U.SC. § 1681g(a)(1)
## INDIVIDUAL CLAIM AGAINST EWS

213. All preceding paragraphs are re-alleged.

214. Count IX is brought by named Plaintiff individually, and not on behalf of any class.

215.  Section 1681g(a)(1) of the FCRA provides, "Every consumer reporting agency shall, upon request… clearly and accurately disclose to the consumer [a]ll information in the consumer's file at the time of the request…"

216.  By letter dated June 19, 2015, delivered to EWS via FedEx, counsel for Ms. Muir requested all information in Ms. Muir's file at EWS, including, "a copy of Ms. Muir's updated background report, consumer report, and other file information on record at Early Warning." The June 19 letter requested certain additional information, as described therein.  A copy of the June 19 letter is attached hereto as **Exhibit H**.

217.  The June 19 letter was delivered under FedEx tracking number 780850087623.  FedEx records reflect the June 19 letter was delivered to EWS in Scottsdale, Arizona on June 24, and signed for by J. Ashcraft.  EWS had, by June 19, 2015, previously corresponded with counsel regarding Ms. Muir, including in its letter of June 1, 2015 attached hereto as Exhibit C.

218.  EWS failed to provide the information requested in the June 19 letter, and failed to respond to the June 19 letter.

219.  EWS violated section 15 U.S.C. §1681g(a)(1) of the FCRA.

### COUNT X
### UNREASONABLE RESTRAINT OF TRADE, 15 U.SC. § 1
### CLASS ACTION CLAIM AGAINST EWS AND BANK OF AMERICA

220.  All preceding paragraphs are re-alleged.  Plaintiff brings Count X for herself and the Count X Class.  Count X alleges violations of the Sherman Act against EWS and Bank of America.

221.  Class X consists of:

All persons subject to an Internal Fraud Prevention Service Report furnished by EWS, in which such report indicated the person committed "Internal Fraud" while an employee of Bank of America, and where such

person was denied employment on the basis of such report.

222. The IFPS service offered by EWS is constituted by, and consists of, one or more agreements by and between EWS and the institutions participating in the IFPS network, including Bank of America.

223. EWS and all such participating institutions, including Bank of America, agree to share information with each other in a manner that unreasonably restrains trade, as alleged more fully above.

224. EWS and Bank of America did in fact share information with each other, pursuant to the IFPS system, in a manner that unreasonably restrained class members from participating in the relevant market.

225. Bank of America and EWS maintain standardized processes and procedures with regard to Bank of America's reporting internal fraud to EWS.  Such processes and procedures fail to require that Bank of America provide accused employees, at the time accusations are made against them, notice of the allegations against them, an opportunity to be heard, or an opportunity to include a statement of dispute on their IFPS report.

226. Bank of America and EWS failed to maintain adequate third-party auditing processes and procedures to assure basic levels of accuracy in reporting employees to EWS for internal fraud.

227. Bank of America and EWS failed to maintain processes and procedures to disclose to accused employees, at the time allegations are made against them, the nature of EWS and that IFPS reports may be disseminated through the relevant market.

228. **Numerosity**.  Upon information and belief, the class consists of hundreds or thousands of persons.  Joinder of claims is impossible or impractical.

229. **Ascertainable**.  The class is ascertainable.  EWS maintains records of all background reports it furnishes, including the contents of such reports, the persons to whom such reports are furnished, and date on or about which such reports are furnished to third parties.

230. **Typicality**.  Named Plaintiff's claims are typical of those of class members.  As set forth more fully above, named plaintiff was denied employment by the unreasonable restraint of trade which, the class action alleges, harms class members generally.

231. **Predominance**.  Common questions of law and fact arise with respect to all class members, and predominate the class action.

232. **Superiority**.  A class action is a superior method of adjudicating the claims brought by the class.  Many class members are unaware of any violations of law perpetrated against them by First Advantage, and statutory and actual damages to which class members are entitled are such that retaining counsel and litigating claims individually would prove overly burdensome on parties, counsel and the courts.  Moreover, individual actions litigating the claims alleged herein could lead to inconsistent results.

## COUNT XI
### UNREASONABLE RESTRAINT OF TRADE, 15 U.SC. § 1
### INDIVIDUAL CLAIM AGAINST WELLS FARGO

233. All preceding paragraphs are re-alleged.

234. Plaintiff brings Count XI for herself individually, and not on behalf of any class, against Wells Fargo.

235. The IFPS service offered by EWS is constituted by, and consists of, one or more agreements by and between EWS and the institutions participating in the IFPS network, including Wells Fargo.

236. EWS and all such participating institutions, including Wells Fargo, agree to share information with each other in a manner that unreasonably restrains trade, as alleged more fully above.

237. EWS and Wells Fargo did in fact share information in a manner that unreasonably restrained Plaintiff from participating in the relevant market.

238. EWS and Wells Fargo violated Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class Members pray for relief as follows:

(a) An order certifying the proposed classes herein alleged under Federal Rule 23 and appointing Plaintiff and her undersigned counsel of record to represent same;

(b) Actual damages suffered by Plaintiff and class members;

(c) Statutory damages pursuant to 15 U.S.C. § 1681n;

(d) Punitive damages;

(e) Treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a);

(f) Attorneys fees, expenses and costs, pursuant to 15 U.S.C. § 15(a) and pursuant to 15 U.S.C. 1681n or in the alternative 1681o;

(g) A declaration that the conduct complained of herein is unlawful;

(h) Equitable and injunctive relief, prohibiting Defendants from engaging in the unlawful conduct complained of herein;

(i) The creation of a common fund available to provide notice of and remedy Defendant's unlawful conduct;

(j) Pre-judgment and post-judgment interest as provided by law; and

(k) All such other relief the Court does deem just, equitable and proper.

Dated:  Ocean, New Jersey
        January 25, 2016

                                    **MARCUS & ZELMAN, LLC**
                                    */s/Ari H. Marcus*
                                    Ari H. Marcus, Esq.
                                    1500 Allaire Avenue - Suite 101
                                    Ocean, New Jersey 07712
                                    Phone: (732) 695-3282
                                    Email: ari@MarcusZelman.com
                                    *Counsel for Plaintiff*


                                    **POSNER LAW PLLC**

                                    _____
                                    By:  Gabriel Posner, Esq.
                                    270 Madison Avenue, Suite 1203
                                    New York, New York 10016
                                    Phone: (646) 546-5022
                                    Email: gabe@PosnerLawPLLC.com
                                    *Counsel for Plaintiff*


## JURY DEMAND

Plaintiff demands trial by jury.


                                    *s/Ari Marcus*
                                    By: Ari H. Marcus, Esq.
                                    *Counsel for Plaintiff*


## LOCAL RULE 11.2 CERTIFICATION

I, Ari H. Marcus, Esq. hereby certify to my own knowledge and based upon information available to me at my office, the matter in controversy is not the subject of any other action now pending in any court or in any arbitration or administrative proceeding.

Dated: January 25, 2016

/s/Ari H. Marcus
Ari H. Marcus, Esq.