NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STEVEN-ANN MUIR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EARLY WARNING SERVICES, LLC; WELLS FARGO BANK, N.A.; FIRST ADVANTAGE BACKGROUND SERVICES CORP.; and JOHN DOES 1-10,<br><br>Defendants. | Civil Action No. 16-521 (SRC)<br><br>OPINION |

**CHESLER**, District Judge

This matter comes before the Court upon the motion to dismiss Counts IV and V of the First Amended Complaint filed by Defendant First Advantage Background Services Corp. ("First Advantage" or "Defendant"). Plaintiff Steven-Ann Muir ("Plaintiff" or "Muir") has opposed the motion. The Court has considered the papers filed by the parties. For the reasons that follow, the Court will grant Defendant's motion to dismiss.

**I.    BACKGROUND**

Wells Fargo rescinded Plaintiff's offer of employment on the basis of information contained in her background investigation report. This motion asks the Court to determine whether First Advantage, a credit reporting agency, was obligated to provide consumer notifications mandated by sections 604(b)(2) and 604(b)(3) of the Fair Credit Reporting Act ("FCRA").

1

The First Amended Complaint alleges as follows. Wells Fargo hired Plaintiff as a customer sales and service representative in August 2014. To complete Wells Fargo's pre-employment screening process, Muir was directed to an internet portal maintained by First Advantage. The only disclosures Plaintiff received were provided to her via that portal, which, Muir alleges, did not clearly and conspicuously advise her that a consumer report will be used to screen her for employment.

In creating its report, First Advantage obtained a report from Early Warning Services, LLC's ("EWS") Internal Fraud Prevention Service, which collects and shares information about internal fraud among banks. The EWS report stated that Muir had been terminated from her previous job with Bank of America for internal fraud. It assigned a "severity level" of 100 and advised Wells Fargo not to employ Muir. First Advantage incorporated this information into the report it furnished to Wells Fargo, including the decision message to "Decline" Plaintiff.[1] Wells Fargo decided to withdraw Plaintiff's offer of employment on the basis of the two reports. On September 5, 2014, Wells Fargo told Muir that it has rescinded her offer due to information found through the background screening process. Several days later, First Advantage, for the first time, notified Muir of the reports' contents. When Muir challenged the allegation of internal fraud, EWS investigated and concluded that Muir's file "contains information which is incomplete, inaccurate, or the accuracy of which cannot be verified." (Am. Compl. ¶ 47.)

Muir's First Amended Complaint alleges that Wells Fargo, EWS, and First Advantage violated the FCRA in failing to provide appropriate disclosures and failing to maintain processes to assure the accuracy of the consumer reports. The First Amended Complaint contains class

---

[1] Plaintiff pleads in the alternative that EWS and/or First Advantage took adverse action against her by including the unfavorable information in the report to Wells Fargo. For the purpose of this motion, the Court will construe this as an allegation against First Advantage.

2

allegations against First Advantage and EWS. As relevant to this motion, Count IV states that First Advantage failed to provide a pre-adverse action notice before including in its background report a message not to employ an applicant or a "severity level" of 100 or more. Count V states that First Advantage failed to provide clear and concise disclosures before procuring consumer reports for employment purposes.

## II. DISCUSSION

### A. Legal Standard

A complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556.) While the Court must accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff, it need not accept a "legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice." *Iqbal*, 556 U.S. at 678.

### B. Overview of the FCRA

Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* to promote fair and accurate credit reporting. Recognizing the vital role assumed by consumer reporting agencies ("CRAs") in meeting the commercial needs for consumer credit, personnel, insurance, and other

3

information, the FCRA serves to ensure that CRAs "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681. To further these goals, the FCRA requires consumer reporting agencies to adopt reasonable procedures to ensure the "confidentiality, accuracy, relevancy, and proper utilization," of consumer information. *See id.* While targeting primarily the consumer reporting agencies, the FCRA also imposes obligations on the users and furnishers of consumer information provided by and to the CRAs.

Defendant First Advantage is a "consumer reporting agency," defined as "any person which . . . regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties . . . ." 15 U.S.C. § 1681a(f). Muir is a consumer for the purposes of the Act and the reports from First Advantage and EWS are each a consumer report. [2]

The procedures for using and furnishing consumer reports in the realm of employment are outlined in 15 U.S.C. § 1681b(b). Before a consumer reporting agency may furnish a report for employment purposes, section (b)(1)[3] states that the agency must obtain certification from the intended user of the user's compliance with sections (b)(2) and (b)(3). Section (b)(2)[4] prohibits

---

[2] A consumer report is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes[.]"  15 U.S.C. § 1681a(d)(1).  There is no dispute that the reports from EWS and First Advantage are "consumer reports."

[3]  (1) Certification from user
A consumer reporting agency may furnish a consumer report for employment purposes only if—
(A) the person who obtains such report from the agency certifies to the agency that—
(i) the person has complied with paragraph (2) with respect to the consumer report, and the person will comply with paragraph (3) with respect to the consumer report if paragraph (3) becomes applicable; and
(ii) information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation; and
(B) the consumer reporting agency provides with the report, or has previously provided, a summary of the consumer's rights under this subchapter, as prescribed by the Bureau under section 1681g(c)(3) of this title.

[4]  (2) Disclosure to consumer . . . a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless–

4

the procurement of a consumer report without (1) clear and conspicuous disclosure that a report may be obtained for employment purposes and (2) written authorization from the consumer. Section (b)(3) is triggered if an adverse action is taken on the basis of the report:

> [I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—
>
> (i) a copy of the report; and
>
> (ii) a description in writing of the rights of the consumer under this subchapter, as prescribed by the Bureau under section 1681g(c)(3) of this title.

In Counts IV and V of the First Amended Complaint, Muir alleges that First Advantage violated sections (b)(2) and (b)(3).

### C. Application of Sections (b)(2) and (b)(3) to Credit Reporting Agencies

First Advantage argues that sections (b)(2) and (b)(3) do not apply to CRAs because the FCRA places distinct obligations on credit reporting agencies and users: section (b)(1) covers CRAs; sections (b)(2) and (b)(3) delineate the obligations of users. The Court agrees.

The definition of a "consumer reporting agency," as "any person which . . . assembl[es] or evaluat[es] consumer . . . information . . . for the purpose of *furnishing* consumer reports to third parties," frames the role of a CRA as a provider of information for the use of others. 15 U.S.C. § 1681a(f) (emphasis added). Section 604(b), titled "[c]onditions for furnishing and using consumer reports for employment purposes" is subdivided into three subsections. The first explicitly addresses consumer reporting agencies. It prohibits CRAs from furnishing consumer reports

---

(i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and
(ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

5

without first receiving certification from the "person[s] who obtain[ ] such report[s]" that they complied with section (b)(2), will comply with section (b)(3) if it becomes applicable, and will not use the consumer report in violation of any equal employment opportunity law or regulation.  15 U.S.C. § 1681b(b)(1).  As the statute requires the report user to certify compliance with sections (b)(2) and (b)(3) to the credit-reporting agency, the onus of in fact complying with these provisions must logically fall on the user.  *See Obabueki v. Int'l Bus. Machs. Corp.*, 145 F. Supp. 2d 371, 393 (S.D.N.Y. 2001), *aff'd*, 319 F.3d 87 (2d Cir. 2003) ("[Section 1681b(b)] contains three subsections that set forth certain obligations for consumer reporting agencies and users such as employers. . . . [E]ach of the subsections need not, and does not, prescribe obligations for both agencies and users. The second and third subsections both affect users.").

A Federal Trade Commission Staff Report and advisory opinions further support the conclusion that subsections (b)(2) and (b)(3) do not apply to CRAs.[5]  These materials discuss sections (b)(2) and (b)(3) as the obligations of employers and separately discuss the obligations of CRAs.  *See* Fed. Trade Comm'n, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations*, 51-52 (2011) ("[a]n employer must comply with the disclosure and consumer authorization requirements of section . . . (b)(2)"; "(b)(3)(A) imposes a specific disclosure obligation on employers."); Advisory Opinion to Beaudette, 1998 WL 34323741, at *1-2 (F.T.C. June 9, 1998) (explaining that the duties of CRAs are specified in section (b)(1), whereas the duties of employers are set out in sections (b)(2) and (b)(3)).

Unless an employer delegates its (b)(2) or (b)(3) obligations to a CRA, the credit reporting agency discharges its responsibilities by obtaining the requisite certifications from users, pursuant

---

[5] Although not binding, these agency interpretations are "entitled to respect . . . to the extent [they] have the power to persuade."  *Christensen v. Harris Cnty.,* 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)).

6

to subsection (b)(1). The person who obtains a report from the agency – the user, not the CRA, must comply with (b)(2) and (b)(3).

### D. Count IV: 15 U.S.C. § 1681b(b)(3)

Plaintiff argues that section (b)(3) nevertheless applies because First Advantage acted as a user by performing an adjudication, that is, making a determination about Muir's eligibility for employment, by generating a decline applicant and/or elevated severity message – each, according to Muir, an "adverse action" based in whole or in part on either the EWS or First Advantage's own report. *See* 15 U.S.C. § 1681b(b)(3)(A). Regardless of the formulation, even if the performance of an evaluative function may turn the CRA into a user, for example, in serving as an agent of the employer, the Court agrees with *Williams v. First Advantage LNS Screening Sols., Inc.*, 155 F. Supp. 3d 1233, 1246 (N.D. Fla. 2015), that such adjudications by a credit reporting agency are not adverse actions under the FCRA.

The FCRA defines "adverse action" as a "decision for employment purposes that adversely affects any current or prospective employee," 15 U.S.C. § 1681a(k)(1)(B)(ii); or, under the "catch-all" provision, "an action taken or determination that is . . . made in connection with an application that was made by, or a transaction that was initiated by, any consumer" and "adverse to the interests of the consumer." 15 U.S.C. § 1681a(k)(1)(B)(iv). While seemingly expansive, these definitions are constrained by the scope of the notice requirement which applies only to the persons who are "intending" to take an adverse action. *See Obabueki*, 145 F. Supp. 2d at 392; 15 U.S.C. § 1681b(b)(3)(A). That means that the statute must allow for a method by which such intent may be formed. *See Obabueki*, 145 F. Supp. 2d at 392. Whether that process is performed entirely by the employer or relies on a recommendation by a CRA makes no difference and does not transform

7

an internal "evaluation that results in a *decision* to take adverse action" into an adverse action. *Williams*, 155 F. Supp. 3d at 1246.

Enveloping interim assessments which do not directly affect the consumer within the scope of "adverse action" would make compliance with the FCRA's pre-adverse notice requirements a shifting target dependent on the after-the-fact determinations of a disappointed applicant in how to parse an employment decision into a series of adverse steps. *See Obabueki*, 145 F. Supp. 2d at 392 n.31 ("such a ruling would effectively allow every employee who suffers an adverse employment action following a credit agency report to file an FCRA claim asserting that the decision was made prior to the sending of the intent letter, on the ground that the intent letter reflects that a decision has already been made."). Muir splinters the rescission of her offer into three adverse actions: the decline applicant and severity determination by EWS, the decision to generate and/or include that message by First Advantage,[6] and the withdrawal of the offer by Wells Fargo, effectively demanding three pre-adverse action notices in conjunction with a single detrimental outcome. (Am. Compl. ¶¶ 119-122, 129.) At each of these junctures, however, Wells Fargo retained the power to disregard the messages from the CRAs and hire Muir, making these steps part of the consideration and intent-formation process, not stand-alone triggers of Muir's FCRA rights.

At the extreme, Plaintiff suggests that even the furnishing of a consumer report containing negative information could be an adverse act because such provision is a "decision for employment purposes that adversely affects any current or prospective employee." (Pl.'s Op. Br. at 9-10) (quoting *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 332 (D. Conn. 2009)). This

---

[6] Count IV of Plaintiff's Complaint applies to EWS and/or First Advantage. (Am. Compl. ¶¶ 126, 129.) This leaves the possibility that both EWS and First Advantage could be liable for failing to provide a pre-adverse action notice for one message that trickled up to Wells Fargo.

reading collapses statutory distinctions between CRAs and users, turning every CRA into a user, at least to the extent that there is anything unfavorable in the consumer report. This understanding is inconsistent with the FCRA, which defines credit reporting agencies as entities that assemble, evaluate, and furnish consumer reports. 15 U.S.C. § 1681a(f). CRAs do not become users based on the contents of the reports they generate. *See, e.g.*, 15 U.S.C. § 1681k (permitting CRAs to report information that is likely to have an adverse effect upon a consumer's ability to obtain employment); 15 U.S.C. § 1681m(a) (requiring "users taking adverse actions on basis of information contained in consumer reports" to "provide to the consumer . . . a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken").

For these reasons, the Court declines to follow *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 542 (E.D. Pa. 2012), which held that a CRA took an adverse action against a prospective employee when it verified a criminal record match and adjudicated the employee as noncompetitive. *Goode* justified this conclusion in part based on the fact that the employer engaged in no further analysis after the CRA made an adjudication, effectively turning the adjudication itself into the final decision.[7] *Id.* at 540. Where that is the case, according to *Goode*, the employee is deprived of a meaningful opportunity to exercise the rights created by the pre-adverse action notice requirement, the purpose of which is to allow the employee to "discuss reports with employers or otherwise respond before adverse action is taken." *Id.* at 537 (quoting Lynne B. Barr, *The New FCRA: An Assessment of the First Year*, 54 Bus. Law. 1343, 1348 (1999)). Nothing in the FCRA, however, prevents employers from affirming a CRA's recommendation.

---

[7] *Goode's* holding may stretch even further to encompass the decision to furnish a report within the meaning of the term "adverse action." *Goode*, 848 F. Supp. 2d at 539 ("Under *Adams*, LexisNexis's action in providing the report to the employer would constitute an adverse action."). As explained, the Court disagrees.

9

*See Williams*, 155 F. Supp. 3d at 1247 ("the purpose of the pre-adverse action notice requirement is not to eliminate . . . rubber stamping by employers, but rather to slow it down and allow consumers time to address any errors in the consumer report before action is actually taken."). Moreover, an employer's subsequent actions or inactions based on a CRA's report cannot determine whether a CRA complied with its statutory obligations before furnishing the report to the employer. Unless the employer delegates the ultimate decision-making responsibility to the CRA as its agent, it is the employer, not the CRA, who intends to act based on the consumer report. Muir pled that Wells Fargo, not First Advantage, determined to rescind and then rescinded her offer.[8] (Am. Compl. ¶¶ 45, 61.) Thus, Wells Fargo, not First Advantage, used the EWS and/or First Advantage consumer reports to take an adverse action and was responsible for sending a pre-adverse action notice in accordance with subsection (b)(3). Because the "Decline" applicant and/or severity messages generated by First Advantage are not adverse actions within the meaning of the FCRA, the Court will dismiss Count IV of Muir's Amended Complaint with prejudice.

### E. Count V: 15 U.S.C. § 1681b(b)(2)

Muir also alleges that First Advantage violated section (b)(2) because it procured the EWS report without providing the requisite disclosures. Section (b)(2) states that "a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer," without first (i) making a clear and conspicuous disclosure before a report is procured; and (ii) obtaining authorization from the consumer. *See* 15 U.S.C. § 1681b(b)(2)(A). According to Muir, Wells Fargo directed her to a First Advantage portal to initiate the background investigation process. That portal was the only source of disclosures regarding

---

[8] For purposes of the class count, Muir pleads that a decline applicant message or "severity level" of 100 or more would *foreseeably* cause an applicant to lose employment. (Am. Compl. ¶ 129.) The final arbiter thus remains Wells Fargo.

10

consumer reports, and failed to satisfy the statutory requirements.  Muir zeroes in on the term "person" to argue that First Advantage is liable because it is a "person" who procured a consumer report.

As discussed above, this reading ignores the delineation of responsibilities specified in section (b)(1) between credit reporting agencies, who obtain certification of compliance with sections (b)(2) and (b)(3), and users who must comply with sections (b)(2) and (b)(3).  It is the employer, not the credit reporting agency that "procure[s] a consumer report . . . for employment purposes[.]"  *See* 15 U.S.C. § 1681b(b)(2).  The consumer reporting agency furnishes the report and ensures that the purpose of the intended use is proper.  *See* 15 U.S.C. § 1681e(a); *see also Lagrassa v. Jack Gaughen, LLC*, 09-cv-0770, 2011 WL 1257371, at *2 (M.D. Pa. Mar. 30, 2011) ("§ 1681b(b)(2) . . . applies only to *users* of a report, rather than agencies that furnish the report.").  Thus, the employer, not the credit reporting agency, must provide the requisite disclosures and obtain consent.

This does not change because First Advantage procured the EWS report for Wells Fargo.  As Plaintiff herself pleads, Wells Fargo caused the EWS report to be procured.  (Am. Compl. ¶ 153.)  Wells Fargo must then comply with section (b)(2).  The statute does not require a multiplicity of disclosures and Muir herself accepts that a consumer only needs one.  (Pl. Op. Br. at p. 16.)  That one must come from Wells Fargo.  Although it is possible for an employer to delegate responsibility for disclosures to a CRA, Muir's First Amended Complaint does not plead that this occurred.  Allegations that Wells Fargo outsourced the screening process to First Advantage and that First Advantage maintained the internet portal through which the transaction occurred are insufficient to establish that Wells Fargo shifted its duties for FCRA compliance to

11

First Advantage. Thus, the Court will dismiss Count V of the First Amended Complaint without prejudice.

### F.  Willfulness

Finally, Muir alleges that the violations of sections (b)(2) and (b)(3) by First Advantage were willful. A plaintiff may recover statutory and punitive damages for a willful violation, 15 U.S.C. § 1681n(a), but is limited to actual damages if the violation is negligent. 15 U.S.C. § 1681o(a). As the Court has concluded that First Advantage did not violate sections (b)(2) or (b)(3), there is no issue regarding willfulness.

## III.  CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion to dismiss Counts IV and V of the Amended Complaint. An appropriate Order will be filed.


        s/ Stanley R. Chesler  
        STANLEY R. CHESLER  
        United States District Judge

Dated:  September 15, 2016